UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                               )
UNITED STATES OF AMERICA,      )
                               )          Criminal Action
          Plaintiff,           )          No. 19-10245-ADB
                               )
v.                             )
                               )
TONY JOHNSON,                  )
                               )
          Defendant.           )
                               )
```

BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE

SENTENCING

May 18, 2023
9:18 a.m.

John J. Moakley United States Courthouse
Courtroom No. 17
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    On Behalf of the Government:
      Lauren A. Graber
 3    US Attorney's Office - MA
      J. Joseph Moakley U.S. Courthouse
 4    1 Courthouse Way
      Suite 9200
 5    Boston, MA 02210
      617-748-3100
 6    Lauren.graber@usdoj.gov

 7
      On Behalf of the Defendant:
 8    Joan Maffeo Fund
      245 First Street, Riverview II, Suite 1800
 9    Cambridge, MA 02142
      617-945-9693
10    Joanmfund@gmail.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3    before the Honorable Allison D. Burroughs, United States
 4    District Judge, United States District Court, District of
 5    Massachusetts, at the John J. Moakley United States Courthouse,
 6    One Courthouse Way, Courtroom 17, Boston, Massachusetts, on
 7    May 18, 2023.)
 8    (Case called to order.)
 9              THE CLERK:  Will counsel identify themselves for the
10    record.
11              MS. GRABER:  Good morning, Your Honor.  Lauren Graber
12    for the United States.
13              MS. FUND:  Good morning, Your Honor.  Joan Fund for
14    Mr. Johnson, who is to my left.
15              THE COURT:  Mr. Johnson, you can sit down if you're
16    more comfortable.  Don't worry about it.  Just pull that
17    microphone closer to your mouth.
18              THE DEFENDANT:  All right.  Thank you.
19              THE COURT:  All right.  We are here for Mr. Johnson's
20    sentencing.  In preparation for the sentencing I have received
21    and read the Presentence Report, as revised on May 11, the
22    defendant's sentencing memorandum, which was filed on May 9,
23    and I also received a letter filed on his behalf on May 16, the
24    government's sentencing memorandum, which was filed on May 13,
25    and also filed with the defendant's sentencing memorandum was
```

 1    his certificates on mindfulness and peaceability and conflict

 2    resolution.

 3            From Probation, Ms. Victoria, anything else I should

 4    have considered?

 5            U.S. PROBATION:  No, Your Honor.

 6            THE COURT:  I take it nothing has been withheld from

 7    the report?

 8            U.S. PROBATION:  No, Your Honor.

 9            THE COURT:  Ms. Graber?

10            MS. GRABER:  That's everything, Your Honor.

11            THE COURT:  Ms. Fund?

12            MS. FUND:  Your Honor, my client today gave me his

13    certificate, which I will file post this proceeding, so I would

14    like the court to be aware of that.  It was his pre-CDL

15    training, he got the certificate on May 8 of 2023.  It's also

16    the reason that we had requested that this sentencing be

17    continued so he would be allowed to complete the CDL course,

18    and he did so successfully.  Thank you.

19            THE COURT:  I'm sorry.  I obviously haven't seen the

20    certificate, but I'm aware from the filings that he was taking

21    that course, so I understand.

22            MS. FUND:  Thank you, Your Honor.

23            THE COURT:  All right.  Mr. Johnson, have you had an

24    opportunity to review the Presentence Report and go over it

25    with your attorney?

1          THE DEFENDANT:  Yes, I have, Your Honor.

2          THE COURT:  I guess I should ask Ms. Fund first.  Have

3      you had an opportunity to review the report?

4          MS. FUND:  Yes, Your Honor.

5          THE COURT:  And have you had full opportunity to

6      discuss it with your lawyer, Mr. Johnson?

7          THE DEFENDANT:  Yes, I have.  She made an appointment

8      on a Zoom meeting for me last week, so we spoke about it.

9          THE COURT:  Okay.  No objections on the part of the

10     government, correct?

11         MS. GRABER:  That's right, Your Honor.

12         THE COURT:  There are eight objections on the part of

13     the defendant, so I'm going to go through them.  Ms. Fund, I'm

14     going to comment on some of these.  You let me know if you want

15     a more detailed review of any of them.

16          For 1, 2, 4, and 5, I have noted but don't require any

17     further action on my part other than to note the information.

18          Objection 8, the report has been amended.  That leaves

19     objections 3, 6 and 7, all which have to do with the

20     calculation of his criminal history.  And from my review on it,

21     and I'm happy to hear you, Ms. Fund, if you want to argue, but

22     the criminal history points have been correctly scored and the

23     Criminal History Category has been correctly calculated.

24         MS. FUND:  I do see the probation officer's response.

25     I would just submit to the court that part of the objections

1    really also, I would submit to the court, highlight that my

2    client, on certain things, that information of the facts,

3    violent offenses are contained in the report that don't

4    necessarily even correspond with what the conviction was.

5         In other words, it was a disciplinary action when we

6    talk about a shank that was nol prossed.  So part of this was

7    highlighting to the court that the idea of violent conduct of

8    my client, that he objects to, even though somebody -- he has

9    pled to cases, that he objects to certain of the facts that

10   were contained in the reporting.

11        And in addition, Your Honor, I do understand that

12   Probation has scored 13.  Just for the record, Your Honor, I

13   would submit that 11 was a more appropriate score based on

14   timing, if you will.  I do acknowledge that the Probation

15   Department has highlighted when the dates of conviction were

16   versus the current offense so that it did fall within the

17   ten-year period.

18        THE COURT:  Well, if you want to make an argument that

19   the Criminal History Category overstates the seriousness of his

20   record, you can make that argument, but I'm going to make a

21   finding that they've correctly calculated the criminal history

22   score --

23        MS. FUND:  Thank you, Your Honor.

24        THE COURT:  -- and then the category based on that.

25        All right.  So where that leads us is he is, as it

1  turns out, a career offender.  Do you want to be heard on that,

2  Ms. Fund, or are we going to agree he's a career offender?

3  MS. FUND:  Your Honor, at this time I'm relying on the

4  plea agreement in terms of the calculations.  I would say that,

5  according to the criminal conduct, it would appear to be, yes,

6  we would agree it was a career offender.

7  THE COURT:  Okay.  So that puts him at a base offense

8  level of 34, which is reduced by three points for acceptance of

9  responsibility.  That leaves him -- the guideline sentencing

10  range, which I understand this is a (C) plea and I will be

11  sentencing you between 60 and 80 months, but just so we're all

12  in agreement on the math, that leaves us an advisory guideline

13  sentencing range of 188 to 235 months, given his Criminal

14  History Category of VI.

15  Do I have that right, Ms. Victoria?

16  U.S. PROBATION:  Yes, Your Honor.

17  THE COURT:  Ms. Graber?

18  MS. GRABER:  Yes, Your Honor.

19  THE COURT:  Ms. Fund?

20  MS. FUND:  Yes, Your Honor.

21  THE COURT:  And in addition to that, I know the

22  parties have agreed on 48 months for supervised release, but

23  the range is four to five years, the fine range is 30,000 to.

24  $6 million, and he'll have to pay a special assessment of $200.

25  Correct, Ms. Victoria?

```
1              U.S. PROBATION:  Yes, Your Honor.

2              THE COURT:  Ms. Graber?

3              MS. GRABER:  Yes, Your Honor.

4              THE COURT:  Ms. Fund?

5              MS. FUND:  Yes, Your Honor.

6              THE COURT:  So I've already accepted his plea and I'm

7    going to accept his plea agreement and will be sentencing him

8    between 60 and 80 months.  I have seen the government's

9    recommendation, but I'm happy to hear from you, Ms. Graber.

10             MS. GRABER:  Thank you, Your Honor.  Just briefly, you

11   know, Mr. Johnson is the second drug-only career offender this

12   court has sentenced.  We heard Your Honor the last time when we

13   came in with a sentence that Your Honor deemed I think

14   unreasonably high.  We are back with what we believe is a

15   reasonable request.

16             The 80 months is appropriate I think not only because

17   it reflects this defendant's conduct, in particular the fact

18   that he was one of the only other defendants other than

19   Mr. Otero and Mr. Joseph and Mr. Frey, who received a mandatory

20   minimum.  In other words, we had provable drug weight, which

21   was over 100 grams, as to this defendant.  That differentiates

22   him from Eric Brando in a meaningful way.  We couldn't prove

23   any particular drug weight as to Eric Brando.

24             THE COURT:  Mr. Brando got 66 months, right?

25             MS. GRABER:  That's right, Your Honor.  So I think
```

1  that's our floor here because for all the reasons set forth in

2  the memo and I'll just briefly touch on, Mr. Johnson is more

3  culpable.  His record is worse.  He is -- you know, there are

4  career offenders in the same regard, except the predicates are

5  different.  As I noted, Mr. Brando had drug-only predicates as

6  the guidelines refer to them.  Mr. Johnson has violent

7  predicates, which is a predictor of recidivism, according to

8  the statistics.

9       I'll also note that even if the career offender

10  guideline had not applied, Mr. Johnson's guidelines would be 77

11  to 96 months, and the government's recommendation of 80 months

12  would be really at the low end of his actual natural

13  guidelines.

14       And so, you know, Your Honor, I think all of those

15  factors, plus as is reported in the Presentence Report, while

16  he has completed some programming, which is great to hear

17  about, he has also racked up a number of disciplinary

18  violations, including as recently as December 2022 for fighting

19  and violence and threatening the correctional officers, which

20  are all serious concerns within a facility.

21       So, Your Honor, I think for all of those reasons, an

22  additional 14 months on top of Mr. Brando's 66 is warranted for

23  Mr. Johnson for his particular circumstances, his conduct, both

24  during this case and since then, and would avoid unwarranted

25  sentencing disparities in this case.

1          THE COURT:  Ms. Fund.

2          MS. FUND:  Thank you, Your Honor.

3          THE COURT:  Hold on.  I just want to respond to one

4   thing you said earlier.  In terms of prior criminal

5   convictions, I don't really look at them.  I take the score and

6   I don't look at the -- I really don't look at the underlying

7   conduct.

8          I hear, I can see enough from the score to credit what

9   Ms. Graber says about there having been some charges that

10  involved violence, but I don't really go into the narratives.

11  I just look at the score, so I'm not -- which is why I note I

12  don't feel I need to resolve some of those factual

13  discrepancies because they really don't factor into what I'm

14  doing.

15         MS. FUND:  Thank you, Your Honor.  And just to follow

16  up on that, my client has been sentenced to the crimes that he

17  was convicted of.  So I would submit to the court, although

18  we're looking at his conduct, I think we need to also look at

19  him today.

20         It is very difficult for an individual to be

21  incarcerated, and I know the Commonwealth has mentioned about

22  disciplinary reports, but sometimes it is a life-saving

23  situation.

24         THE COURT:  11 of them?

25         MS. FUND:  Pardon me?

1          THE COURT:  11 of them?

2          MS. FUND:  Well, Your Honor, I would submit to the

3    court it has been a difficult journey at Plymouth and that my

4    client has been able to -- there were a lot of things that

5    happened that I'm not able to kind of elaborate on, but I would

6    submit to the court that he has been working in another sense

7    to maintain not only his self but to maintain his future, when

8    he's not in this environment where he does have to fight on a

9    day to day basis, whether individuals are coming after him for

10   a variety of reasons, for his past history.  So I would ask the

11   court to look beyond that.

12         I would submit to the court that, as the court has

13   seen, he has done a great -- he really has done a great amount

14   of work.  And even the letter that was recently provided, his

15   goal is to be a different person.  And in fact, he has asked me

16   to ask the court at the end of this if you could recommend

17   sentencing him to the institution in Pennsylvania, Schyulkill.

18   And the reason for that is to get away so that he can continue

19   in his development to be a better person, to be a peaceful

20   person and to work for his children so that he can now show

21   them a better way of life.

22         Your Honor, I would submit to the court that the

23   person that can articulate this the best is my client, and he

24   would like to address the court so that the court can hear from

25   him his goals, his dreams and what he's done.  And I would

1    submit to the court, after hearing from him and understanding

2    where he's coming from and where he's going, that the 60 months

3    would be an appropriate sentence.

4            THE COURT:  Mr. Johnson.

5            THE DEFENDANT:  I can speak?

6            THE COURT:  Yes, your turn.  You can stay sitting,

7    whatever is comfortable.

8            THE DEFENDANT:  All right.  As far as, I feel that

9    it's easy for somebody to look at the black and white and see

10   my record and make a judgment based on that, but I'm a human

11   being, Your Honor.  I'm my mother's son.  I'm a father.  I'm a

12   brother.  And I agree I made a lot of mistakes in my life.  I

13   made a lot of mistakes in my life that I'm not proud of.

14           I didn't have a role model growing up.  Everything

15   that I basically seen and I wanted to do, I did.  I left home

16   at 15 from an abusive household, and everything I learned I

17   learned in the streets, being on my own, observing, tough --

18   trials and tribulations.  So that's how I was able to learn

19   through experience.

20           As far as being in jail, jail hasn't helped me.  In

21   fact, it made things a lot harder for me.  I'm doing my

22   sentencing because I have a problem, and my problem was never

23   met.  It was met by throwing me in jail.  And in jail, I have

24   to survive for me to get home.  And what I mean by that --

25           THE COURT:  Hold on.  What's the problem?

1           THE DEFENDANT:  What I mean by being in jail is --

2           THE COURT:  You said you have a problem that wasn't

3      addressed in jail.

4           THE DEFENDANT:  I have a mental health issue.

5           THE COURT:  Okay.

6           THE DEFENDANT:  I'm bipolar, I suffer from trauma,

7      depression.  I'm bipolar, lot of trauma that I have bottled

8      inside that, when it's released, I react with violence.  I'm

9      not saying that that's the action or the course that I should

10     take.  As far as my disciplinary reports being in jail, as much

11     as I try to keep my head down and stay underneath the radar, I

12     can control my actions, but I can't control others.  But I'm

13     not going to let nobody hurt me because I got to get home to my

14     kids and my family.  And everything else, if I let somebody

15     hurt me or harm me, that could stop me from going home.

16          And as far as I wrote today, I've had time to think

17     about my actions and everything else because I took the time to

18     take advantage of the time that I was sitting in Plymouth,

19     regardless of the mistakes I made, my D reports because I truly

20     and genuinely want to be a better person.

21          I got a son and daughter.  I've been in and out of

22     their lives, and it has a huge effect on them, especially when

23     I talk to them and stuff on the phone.  They want to know when

24     I'm coming home or -- they don't have that complete family

25     because I grew up in a two-family home with both parents

1  underneath one roof.  My parents didn't do drugs, and they

2  didn't raise me to be this way.  But, like everybody else has a

3  choice in life, everything begins and ends with a choice.

4  Those were my choices.

5        And I stand here today, Your Honor, with tomorrow in

6  your hands.  I understand that, Your Honor, you have a job to

7  do.  A decision will be made, and to me it's an important one

8  because it's my life.  Before you determine my fate, I, Tony

9  Johnson, Jr., accept full responsibility for my actions,

10 actions for making poor choices, the very reason I'm in this

11 position to begin with being a direct reflection of what I've

12 done with the time I've been given, invested in more negative

13 activities than I have positive throughout the course of my

14 life.

15        It wasn't just me and my family that has been affected

16 but the many families that have suffered at my hands, a

17 problematic epidemic that I myself, co-defendants and others

18 have contributed to.  I'm deeply sorry to those families that

19 have been heartbroken and their lives shattered from a loved

20 one or a close friend who has either succumbed or is still

21 battling addiction of this deadly disease.  I'm deeply sorry

22 for the pain, loss, grief, anger and anguish resulting in both

23 destruction and devastation amongst those families that

24 suffered down to the innocent children deeply scarred by the

25 actions of having one or both parents leaving them, to hold on

1    to the hurt, frustration and disappointment, to never being

2    able to get that time or experience back.  There are no

3    winners, there are only losers because there is still the

4    suffering of families torn apart and the boundless struggles

5    and need by the absence of an incarcerated parent, which

6    further hurts the next generation of children who end up

7    experiencing the same or even a greater form of oppression due

8    to their parents' longer prison term.

9        I have a daughter and I have a son who I've been in

10    and out of their lives doing more harm than good, causing a

11    fractured relationship.  Sadly, my situation is far from

12    unique, but it's embarrassing and alarming knowing that I let

13    my entire family down.  When I'm supposed to be a role model to

14    my children, I failed up to live up to that position, and jail

15    isn't the reality I wish to bring down in my children.

16        Today is the 18th of May, two days shy of four years

17    that I've been incarcerated.  I knew in that duration that I

18    needed to be a better man, father.  I felt guilty about the

19    consequences of my decisions.  These four years has been an

20    investment into myself.  By doing the work, obtaining

21    knowledge, information and education made it easier for me to

22    make better decisions that would not only affect me but those

23    involved with me, including my children, because of -- what

24    I've been able to learn and a better way to handle them and

25    have an impact moving forward with a combination of time of

1   hard work, which is proved that I sustained with certificates

2   from a number of programs I graduated from which took patience

3   that others didn't have or didn't want to better themselves.

4        Although I may not be able to change my past, Your

5   Honor, but I can change the way my past affects my future.  I

6   no longer wish to play the prison game, nor self-defeating

7   rules or participate in this atmosphere of fear and negativity

8   while the prison continues to profit from myself and others'

9   mistakes.  I have many pieces to pick up and put back together

10  beginning with my family and children.  I have a son who is at

11  an age where influences from music, movies and friends begin to

12  play a role, whether good or bad, and my presence is needed

13  outside than in here, where I need to be there to guide him,

14  protect him and keep him from being another statistic by making

15  better decisions rather than my same mistakes.

16        Your Honor, I know the D.A. is asking for 80 months.

17  I, on the other hand, Your Honor, believe 60 months is fair.  I

18  applied myself and took the measured steps needed by investing

19  time to get a positive result.  And for that, thank you for

20  your time and your consideration, Your Honor.

21        THE COURT:  What's your plan for when you get out?

22        THE DEFENDANT:  I took the CDL course because I wanted

23  to get a job so I could be a stand-up citizen, something that I

24  haven't done in a while because most I ever did on the streets

25  is seven months.  And I want to be a homeowner one day.  And

1    I've been -- I got a lot of talents.  I'm at creative poetry, I

2    write books.  I'm just trying to have a legacy, you know, to

3    leave my kids something.

4          So I understand that, when I get out, it's going to be

5    hard work that I have to sit there and really buckle in, and I

6    don't want to swear, but bust my tail.  And I'm willing to do

7    that because I feel that if I can hustle and spend time, than

8    doing negative, then I can hustle the right way and do that

9    time in a positive light, and the payoff will be more better.

10          THE COURT:  So I'm just looking at the Presentence

11    Report while you're talking, and you know, you talk about

12    having trauma, and when it comes out, it comes out in anger,

13    and a lot of these disciplinary violations in prison are for

14    fighting.  And the most recent one was December.  It hasn't

15    been that long.

16          THE DEFENDANT:  Yes.

17          THE COURT:  So how are we going to change that?

18          THE DEFENDANT:  Being on medication, which has helped

19    me think about things a lot, but also taking the classes that I

20    took, it really has helped me a lot to make better decisions.

21    Like I said before, I can accept my actions and control my

22    words and my actions, but I can't control others.  So the D

23    report that you're talking about, like, I'm guilty for

24    fighting, yes, I am.  Unfortunately, I wish that the

25    circumstances was different because I know that everything that

1    I do I'm closely being monitored, especially appearing in front

2    of the court today.  So if I can go back, I don't know if this

3    situation would have been different because that would depend

4    on the other person, but I tried everything to avoid the

5    situation.

6         THE COURT:  There's very few people I see that come in

7    front of me that have 11 disciplinary violations.  Sometimes

8    people have a few when they first get in, kind of adjusting,

9    right, to transition, but you've kind of had them all

10   throughout.

11        So, I mean, what are you doing about that anger?  How

12   do we make sure that when the trauma bubbles up that you react

13   in some way other than anger?  Because it's a risk for me to

14   put you back on the street where you might hurt somebody.

15        THE DEFENDANT:  Well, a lot has to do with my

16   medication.  I've been taking my medication regularly.  I took

17   a course in anger management, errors in thinking, and to make

18   better decisions, and I know how to process my anger, how to

19   call it out.  When I get to that point where I'm getting upset,

20   because a lot of times I don't think when my anger arises, but

21   I start to see why my anger arises, and I'm able to call that

22   out and put a lid on it before it actually boils over.

23        And I think that's helped me lately because I gained a

24   lot of respect for the COs.  I've been working in the pod, and

25   I've been out of trouble for a while now and keeping my head

1    down low and doing the things that's required of me.

2        I have a job that's in the unit where I buff the

3    floors.  I get up at 8:00 in the morning every day.  I mop, I

4    sweep.  At nighttime I buff the floors.  So that comes with a

5    lot of responsibility that they place on me and stuff, and I

6    have a lot of people that's rooting for me.

7        THE COURT:  Your kids, I'm looking at the Presentence

8    Report, and it looks to me like when you're out of prison that

9    you try and stay involved in your daughter's life.  But you've

10   talked a lot here about your son, too, and it doesn't look like

11   you've had much of a relationship with him based on what's in

12   the report in front of me.  So what have you done to repair

13   that relationship so far, or is that something you're looking

14   to do when you get out?

15       THE DEFENDANT:  Your Honor, every time I come home,

16   I'm in my son's life.  It's my daughter that I haven't been a

17   permanent fixture because me and her -- me and my child's

18   mother, we don't get along, and she makes it more difficult for

19   me to get along to get my daughter.  But when I'm home, I do

20   get my kids.  I go to my son's basketball games.  I help him

21   with his homework.  I put him on the bus at 8:05 in the morning

22   and I get him off the bus at 3:05.  I don't consider it

23   babysitting him because that's my job as a father to watch him

24   because he's mine.

25       Other than that, I talk to him about his friends,

1    so-called friends that he thinks that it's cool to chill with

2    because he tries to follow my footsteps, and I tell him that

3    it's not appropriate, it's not right.  The reason I'm in this

4    situation is because I was bad and I was punished and that I

5    want better for him.  And that's one thing that I assured him

6    every time is that he has nothing to do with me being away from

7    him, that I love him regardless of his decisionmaking, but I

8    want better for him, and I don't want this jail to be a part of

9    his life or him to end up in my situation.

10            My daughter, last time I had my daughter was before I

11    got locked up, May 20.  I had her for Christmas and I spoiled

12    her.  I spoil all my kids.  That's what I'm supposed to do as a

13    father.  I like being a father.  I think that's one of the

14    greatest accomplishments that I've made, being a father,

15    despite me being in and out.  But just because I go to jail, I

16    don't stop being a father, so I try my best to reach out,

17    communicate, write letters, try to get them to come visit.  But

18    then again, I'm only one person, I'm only one half because

19    their mother makes the decision.  She got the last say-so.  So

20    it's definitely been a difficult journey.

21            THE COURT:  All right.  Well, I have to sentence you,

22    obviously.  That's why we're here today.  Look, Mr. Johnson, I

23    know what the grapevine is like out there, so you probably know

24    that I sentenced Mr. Joseph to 30 years the other day and

25    Mr. Basilici to more than 22 that same day.  And your sentence

1    is between 60 and 80 months.  That's what your (C) plea says.

2    So, you know, those two are going to be in prison for so long

3    that it's hard to think about what they're going to do when

4    they come out and what they're going to be to their kids.  And

5    Mr. Otero is this afternoon.

6            For you, no matter where I sentence you in that range,

7    you're looking at a pretty short bit, right?  You're almost

8    done.  And you're going to have to get out of prison and sort

9    of figure this out.  You're at an age where you still have time

10   to get a job and buy a house and be a dad to your kids.  But

11   your criminal history score, these sentences just get longer

12   and longer and longer.  So you're kind of at a crossroads, you

13   know.

14           Look, I don't know you beyond the discussion that

15   we've had today and what I know about your criminal offense.

16   But I'm reading this report and I think that you've done a lot

17   of things that are impressive to kind of get yourself on a

18   better track, but there's other things that are not so great,

19   like infractions in prison.  And I'm not -- I read this report

20   and I think that you have a problem with drugs and alcohol

21   which is probably, you know, a coping mechanism for you, but

22   I'm not sure you've really grappled with the fact that those

23   are coping mechanisms for you and not good ones.

24           So all that being said, your childhood was horrific.

25   It's one of the worst I've seen.  And the fact that you can

1    talk about a future for yourself and the kind of dad that you

2    want to be, on the one hand, that's pretty impressive given

3    where you came from.  Like, you've absorbed that idea of being

4    better for your own kids than your parents were for you, which

5    is great.  On the other hand, in some ways you're kind of

6    following your dad's footsteps, right?  You're not really there

7    for them in a way.  So this is kind of your chance, right?

8           You're at a crossroads, and you're going to get some

9    training on the driving.  And you're going to be on supervised

10   release after I sentence you, and we're going to give you a lot

11   of supports for that to make sure you get mental health

12   treatment and job training if you need it, all of those things.

13   We're trying to set you up for success.  But at some point,

14   it's got to come from you.  You're the one that's going to make

15   those decisions about, to put it kind of little bit cliche, but

16   you're the one that's going to decide what you're going to be

17   when you grew up.

18          So I had fully intended coming out and sentencing you

19   to the 80 months.  I need to sentence you to something higher

20   than what Mr. Brando got.  Your guideline range was, I haven't

21   even done the math on it, but 188 to 235 months.  That's 15 to

22   just shy of 20 years, something like that.  So we're talking 60

23   to 80, which is more like five to seven.  You're already doing

24   much, much better.  This discussion has impressed me, but I

25   want you to understand that there's still a lot of warning

1    flags around your future for me.  And I'm putting you on

2    supervised release for the 48 months that you all agreed to.

3    And you understand how supervised release works, that if you

4    commit a crime while you're on supervised release or you do

5    anything to violate your conditions of supervised release, you

6    come back before me, and I will remember this discussion and

7    the promises that you made to me about what kind of person you

8    hope to be.  And if you're not living up to that, you and I

9    will deal with the consequences of that together.  Do you

10    understand me?

11           THE DEFENDANT:  Yes, Your Honor.

12           THE COURT:  Do you have any questions about what I

13    just said?  Do you have anything you want to say back to me?

14           THE DEFENDANT:  No.

15           THE COURT:  All right.  So I'm shaving off the 80

16    months I was going to give you, and I'm going to give you less

17    than that.  That is really a direct result of what you said

18    here to me today and the reflection that I think that you're

19    giving to this.  But again, I need to sentence you to something

20    higher than Mr. Brando just as a matter of fairness and

21    avoiding sentencing disparities and just a reflection of the

22    fact that what you've done is more serious than what he's done

23    based on what I know about the two of you.

24           So anyway, it's my job to figure out a reasonable

25    sentence.  In this case I'm constrained by the (C) plea which

1   I've accepted and I will sentence him between 60 and 80 months.

2          In determining an appropriate sentence I've considered

3   the advisory guideline sentencing range as well as the range

4   set forth in the (C) plea.  I've considered the nature and

5   circumstances of the crimes at issue here, Mr. Johnson's

6   personal characteristics, his criminal history and, as I said,

7   the need for the sentence to reflect the seriousness of the

8   offense, promote respect for the law, just punishment, serve as

9   an adequate deterrent, that's general and specific, as well as

10  the need to avoid unwarranted sentencing disparities between

11  Mr. Johnson and the other defendants that have already been

12  sentenced.

13         So pursuant to the Sentencing Reform Act of 1984 and

14  having considered the sentencing factors enumerated at 18

15  U.S.C. 3553(a), it's the judgment of the court that the

16  defendant, Tony Johnson, is hereby committed to the custody of

17  the Bureau of Prisons to be imprisoned for a term of 75 months.

18  That's 75 months on each count to be served concurrently.  I'm

19  going to make a judicial recommendation, he doesn't have much

20  time left, but to the extent possible, that he participate in a

21  substance abuse treatment program while in the Bureau of

22  Prisons custody.

23         I'm going to make a judicial recommendation that he

24  continue to participate in psychological care for his mental

25  health needs.  I'm going to make a judicial recommendation that

1    further vocational training be made available to him in order

2    to help him enter the workforce upon release.  As agreed to by

3    the parties, supervised release for a term of 48 months.

4    That's 48 months on each count to run concurrently.

5            Within 72 hours of release from the custody of the

6    Bureau of Prisons, Mr. Johnson, you'll have to report in person

7    to the district you're released.  I'm not going to impose a

8    fine.  No forfeiture, correct, Ms. Graber?

9            MS. GRABER:  That's right, Your Honor.

10           THE COURT:  So I'm not saddling you with any financial

11   burdens when you come out.  While you're on supervised release,

12   Mr. Johnson, you cannot commit another federal, state, or local

13   crime.  You cannot unlawfully possess a controlled substance.

14   You cannot unlawfully use a controlled substance.  You'll be

15   drug tested once within 15 days of release and at least two

16   tests thereafter, not to exceed 104 tests per year, and you'll

17   have to participate or cooperate in the collection of a DNA

18   sample as directed by Probation, comply with any other standard

19   conditions that are in place at the time of your release.

20           Here is the special conditions.  I want you to listen

21   to these because I want to make sure you understand and you

22   think we're giving you the support that you need.  You may

23   reside for a period of up to six months in a residential

24   re-entry center or until you obtain suitable housing that's

25   been approved by Probation.  If you're in a residential

1    re-entry center, you'll have to obey the rules of that

2    facility.  So what this means, if you come out and don't have a

3    place to live, we're going to give you a place to live for six

4    months.  If you have a place to live that Probation approves

5    of, you don't have to go to the residential re-entry facility.

6    It's just to make sure you have someplace to go when you get

7    out.  Do you understand that?

8              THE DEFENDANT:  Yes.

9              THE COURT:  It's not punitive.  It's just to make sure

10    that you have someplace to go while you're sort of getting your

11    feet back on the ground.

12              While you're on supervised release, you'll have to

13    participate in a substance use treatment program and follow the

14    rules of that program.  What that program is, what it looks

15    like will be completely up to Probation.  So that's provider,

16    location, modality, duration, intensity, all of that.  So if

17    they think you need a lot, you'll get a lot.  If they think

18    you're doing okay and need less, you'll get less, but they'll

19    make a decision about what kind of substance abuse treatment is

20    appropriate for where you are when you come out, okay?

21              Also as a special condition there will be the

22    substance use testing, again, that same 104 tests per year, but

23    you may not attempt to obstruct or tamper with any testing

24    methods.  I'm going to prohibit you from drinking alcohol to

25    the point of intoxication, which is .10 blood alcohol.  I'm not

1    going to forbid you from drinking alcohol at all because I

2    don't want to set you up for failure.  Like, it's hard to never

3    have a drink.  It might be better for you to have another drink

4    -- not to have a drink.  I'll leave that for you to figure out,

5    but it won't be a violation of your supervised release

6    conditions if you drink as long as you don't drink to the point

7    of drunkenness.  Okay?

8            I'm going to tell you what I tell every other

9    defendant in your situation.  If you feel the need to get

10   drunk, you go down and you do it in your basement.  You don't

11   do it on the street, you don't do it in the bar, you don't do

12   it with your friends.  That's in your house so you don't get in

13   any trouble.  Do you understand?

14           THE DEFENDANT:  Okay.

15           THE COURT:  Okay.  You'll have to participate in a

16   mental health treatment program as directed by Probation.

17   You'll have to take all medications as directed by your mental

18   health treatment provider.  If you have money or insurance,

19   you'll have to contribute to the costs of all that, but if you

20   don't have insurance or a third-party payor, the costs of all

21   that will be taken care of for you.  You'll have to pay a

22   special assessment of $200.

23           You have some limited rights of appeal.  If you want

24   to appeal what I've done today, you can talk to your lawyer

25   about that.  Do you have any questions about that?

1              THE DEFENDANT:  No.

2              THE COURT:  All right.  It's a short bit, what you

3       have left is short, so use the time to get your act together

4       and do some planning for your future, okay?  I will make a

5       recommendation that he be housed -- I take it you want

6       someplace, not here but relatively close to here?  Is that what

7       you're asking for, Ms. Fund?

8              THE DEFENDANT:  I wanted to --

9              MS. FUND:  Pennsylvania.

10             THE DEFENDANT:  Pennsylvania.

11             THE COURT:  I'm going to recommend that you be

12      incarcerated at a facility in Pennsylvania to the extent that

13      that's commensurate with your needs and the Bureau of Prisons'

14      security needs.  Sometimes those recommendations work and

15      sometimes they don't, but I'll make the recommendation for you.

16             MS. FUND:  Thank you, Your Honor.

17             THE COURT:  So I want this to work for you,

18      Mr. Johnson.  If it doesn't, you and I will be back here

19      together and we'll sort it out.  But again, you've done four

20      years.  I just sentenced you to six years.  I don't know how

21      much good time you've accrued, but you'll be transitioned out

22      in fairly short order.  So start thinking about it and where

23      you're going to live and what you're going to do and how you're

24      going to work on your relationship with your kids because

25      you're in sort of like, you have short enough time left that

1   you should be in your pre-release planning mode in figuring out
2   how you're going to avoid being here again.
3          I like the reflection.  I like the things you're doing
4   in prison.  You still have some challenges in front of you, but
5   I'm rooting for you, and I'm impressed with what you had to say
6   today, which is why you didn't get the 80 months.  And I will
7   be interested in seeing what you do next, but I hope that you
8   and I don't see each other again because that would not be a
9   good day for you.  All right?
10          THE DEFENDANT:  All right.  Thank you, Your Honor.
11          THE COURT:  Do you have any questions?  Do you
12   understand?
13          THE DEFENDANT:  No.  Just, thank you.
14          THE COURT:  Okay.  Anything else, Ms. Victoria?
15   U.S. PROBATION:  No, Your Honor.
16          THE COURT:  Ms. Graber?
17   MS. GRABER:  No, Your Honor.  Thank you.
18          THE COURT:  Ms. Fund?
19   MS. FUND:  No, Your Honor.  Thank you.
20          THE COURT:  Thanks, everyone.  The case is recessed.
21          (Adjourned, 9:56 a.m.)
22
23
24
25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Professional

4    Reporter, Registered Merit Reporter and Certified Realtime

5    Reporter, in and for the United States District Court for the

6    District of Massachusetts, do hereby certify that the foregoing

7    transcript is a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter to the best of my skill and ability.

10                        Dated this 22nd day of September, 2023.

11

12

13                   /s/ Kelly Mortellite

14                   _____

15                   Kelly Mortellite, RPR, RMR, CRR

16                   Official Court Reporter

17

18

19

20

21

22

23

24

25
```